Harmony Realty Company, Appellant, *v.* Commonwealth.

Argued October 7, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

*Harold F. Reed, Jr.,* with him *Reed, Ewing, Orr & Reed,* for appellant.

*R. L. Brennan,* with him *John Alan Conte, Conte & Courtney, Frank E. Roda,* Assistant Attorney General, *Thomas D. McBride,* Attorney General, and *John R. Rezzolla, Jr.,* Chief Counsel, Pennsylvania Department of Highways, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 10, 1958:

The Harmony Realty Company, the plaintiff, owned in Big Beaver Township, Beaver County, a strip of land some 6,080 feet long and approximately 60 feet wide, broken by a gap of 1000 feet at the southern end. The total area involved 9.568 acres. Of this the Commonwealth condemned 7.846 acres for the purpose of reconstructing and relocating State Highway Route

No. 18. The remaining fragments of the plaintiff's land became commercially valueless so that, objectively, the Commonwealth's taking of the plaintiff's property was complete.

The Board of Viewers awarded the plaintiff company $13,725 in damages. The Commonwealth appealed and gained a reduction to $5,000 in the ensuing jury trial. The plaintiff moved for a new trial on inadequacy of verdict which was refused by the lower Court. This appeal followed.

The land in question was at one time a right of way owned by the Pittsburgh, Harmony, Butler and New Castle Railway Company between the City of Beaver Falls and the Borough of Homewood. When the railway was discontinued, circa 1934, the tracks were taken up and three bridges spanning ravines en route were dismantled. As so often happens, when a railroad through a non-populous area is abandoned and the rails removed, the land on which it once rested deteriorates in value. Through disuse and neglect it eventually degenerates into a "barren waste, a wild of sand."

The plaintiff company maintains that its property could still be used for a transportational right-of-way or for the laying of pipe lines. It called three real estate expert witnesses who testified, respectively, that it was worth $21,000, $13,725, and $15,250. The Commonwealth, to the contrary, contended that the terrain involved was practically worthless; that it was incapable of utilization for carrying underground pipe lines because the substratum of the earth was too rocky, and that it could not be used for railroad purposes because of the absence of bridges to carry traffic over the many hollows and ravines in this long, longitudinal, lugubrious land. Hence, the Commonwealth maintained that this sterile strip was scarcely a bargain, even at $1,000.

The appellant argues that since the distance between the Commonwealth's estimate and the appellant's estimate measured $12,725, the jury went awry in announcing damages in the sum of only $5,000. But there is really nothing extraordinary about a jury finding that the seller of land or anything else puts a higher value on the object than the buyer. Both are seeking to make a profit on the transaction. Thus, the owner of a cow sees her fat, healthy and a veritable milk factory; the buyer, for the purpose of bidding, sees her gaunt and barren with protruding ribs and shrunken udder.

In *St. Clair Cemetery Association v. Commonwealth*, 390 Pa. 405, 408, we said on this subject of varying estimates of values in eminent domain cases: "It is not at all uncommon for juries in these cases to reject the estimates of value on both sides and to come to their own fair conclusion of loss suffered. For example, in Lutz v. Allegheny County, 327 Pa. 587, 195 A. 1, we sustained a verdict and judgment for $33,000. Yet the viewers had awarded $24,625; on a first trial the jury had given $40,000; plaintiffs' witnesses had testified to values varying between $107,400 and $136,314; and the defendant's testimony as to loss varied between $15,500 and $20,000. The disparity in estimates certainly cannot of itself be used as a basis for new trial."

But the appellant argues: "The jury could have concluded either that the land was adaptable to and desirable and valuable for utility or pipe line rights-of-way, or simply that it was waste land. There was evidence to support either conclusion. There was no evidence to support any third or compromise conclusion."

Putting aside the inescapable observation that it is quite unlikely that, if the jury had returned a verdict

of $1,000, such a verdict would have satisfied the appellant, even though it would prove the correctness of its logic, it must be noted that a jury, upon physical inspection of a controverted property, may well disagree with the testimony advanced on both sides. In a controversy over the color of a horse, one side may contend that it is a black horse and the other side assert it is white, whereupon the jury, upon inspection of the animal, may find that it is neither black nor white, but gray.

The appellant argues further: "You can't compromise two sets of figures, based upon two incompatible sets of fundamental assumptions and premises. The situation is similar to that of the man who owned a painting, but was ignorant of its value. He was informed by experts on one hand that the painting was an original Van Gogh and therefore worth at least $50,000. He was informed by other experts, however, that it was nothing but an ingenious imitation and worth, therefore, $2,000 at the most. This man then reasoned by 'compromising' the foregoing figures and concluded that the true value of the painting he possessed was about $20,000."

The illustration does not prove the plaintiff's attempted point. It could well be that the painting is neither an original Van Gogh nor a $2,000 imitation. It could be that the canvas has no connection with Van Gogh at all but is an original work painted by an artist named Van Went who was not without talents in his own right and that, therefore, the canvas is easily worth $20,000. Thus, a jury's conclusion that the disputed masterpiece has a value of $20,000 is not a compromise, but an ascertainment of fact.

If juries were not to be allowed to exercise deliberation in arriving at a just sum in condemnation cases, but were compelled to take arbitrarily the plaintiff's

or the defendant's figures, they might then be driven to throwing lots to announce a verdict, if they were dissatisfied with the correctness and fairness of *both* of the extreme estimates. In that event the dice box might as well be substituted for the scales of justice.

What Justice ARNOLD well said in the *St. Clair* case already cited may properly dispose of the case at bar: "It is the rule, rather than the exception, that in eminent domain proceedings the opinions of the experts, as well as the parties, are quite divergent on the questions of value and loss. Most of the evidence in this respect being opinion evidence, it necessarily must be left to the fact-finding body, under proper instructions, to arrive at a just conclusion of market values before and after the taking. In the instant case, the elements of damage were ably and clearly presented to the jury in the testimony, the case was free of trial error, the court's charge was fully instructive and complete, and the verdict should not be interfered with by the court." (p. 407)

Judgment affirmed.